Citation Nr: 1438775 
Decision Date: 08/29/14 Archive Date: 09/03/14

DOCKET NO. 09-39 084 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Hartford, Connecticut



THE ISSUE

Entitlement to compensation pursuant to the provisions of 38 U.S.C.A. § 1151 for an eye disability due to surgeries performed at a VA facility in February 2008 and June 2009. 



WITNESSES AT HEARINGS ON APPEAL

Appellant and Mr. H.L.



ATTORNEY FOR THE BOARD

J. H. Nilon, Counsel


INTRODUCTION

The Veteran served on active duty from January 1964 to December 1965.

This matter comes before the Board of Veterans' Appeals (Board) on appeal of a September 2009 rating decision by the Department of Veterans Affairs (VA) Regional Office (RO).

The Veteran testified before the RO's Decision Review Officer (DRO) in July 2010 and December 2013, and in November 2010 he testified before the undersigned Veterans Law Judge (VLJ) in a videoconference hearing from the RO. Transcripts of these hearings are of record.

In February 2011 and again in August 2012 the Board remanded the case to the Agency of Original Jurisdiction (AOJ) for additional development, which has now been accomplished. Stegall v. West, 11 Vet. App. 268, 271 (1998). 


FINDINGS OF FACT

1. The Veteran had eye surgery at a VA facility in February 2008 and June 2009.

2. The Veteran does not have additional disability as a result of VA eye surgery that was proximately caused by carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on VA's part in providing such treatment or by an event not reasonably foreseeable.


CONCLUSION OF LAW

The requirements for compensation under the provisions of 38 U.S.C.A. § 1151 for additional disability due to VA eye surgery in February 2008 and June 2009 are not met. 38 U.S.C.A. §§ 1151, 5107 (West 2002 & Supp. 2013); 38 C.F.R. §§ 3.102, 3.361 (2013).
REASONS AND BASES FOR FINDINGS AND CONCLUSION

Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA), Pub. L. No. 106-475, 114 Stat. 2096 (Nov. 9, 2000) (codified at 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5106, 5107, and 5126 (West 2002)) redefined VA's duty to assist a claimant in the development of a claim. VA regulations for the implementation of the VCAA were codified as amended at 38 C.F.R. §§ 3.102, 3.156(a), 3.159, and 3.326(a) (2013).

The notice requirements of the VCAA require VA to notify a claimant of what information or evidence is necessary to substantiate the claim; what subset of the necessary information or evidence, if any, the claimant is to provide; and what subset of the necessary information or evidence, if any, the VA will attempt to obtain. 38 C.F.R. § 3.159(b) (2013). Here, the Veteran was notified of the elements required to establish entitlement to compensation under 38 U.S.C.A. § 1151 by a letter in June 2009, and he had ample opportunity to respond prior to issuance of the September 2009 rating decision on appeal. Thus, VA's duty to notify has been met.

The AOJ also provided assistance to the Veteran as required under 38 U.S.C.A. § 5103A and 38 C.F.R. § 3.159(c), as indicated under the facts and circumstances in this case. The Veteran has been afforded a VA examination to determine whether he has any eye disorder secondary to VA surgery; an additional review opinion by a VA ophthalmologist is also of record. The AOJ has obtained VA treatment records relevant to the issue on appeal; i.e., the surgical and post-surgical records relating to the VA treatment the Veteran asserts was performed negligently, as well as VA treatment records before and after surgery. The Veteran asserts that the AOJ has failed to produce copies of the operative reports, as directed by the Board's remand in February 2011, but the Board disagrees. Following that remand the AOJ obtained the operative reports pertaining to the VA surgery in February 2008 and June 2009. The file does not suggest that any additional operative reports were produced. Further, the Veteran asserted to the Board that he had been treated by several private physicians, but he subsequently failed to provide AOJ with authorization to procure those records, and has not submitted those records on his own behalf despite being advised of his entitlement to do so. Accordingly, the Board finds that there has been substantial compliance with the prior remand instructions and no further action is necessary. See D'Aries v. Peake, 22 Vet. App. 97 (2008) (holding that only substantial, and not strict, compliance with the terms of a Board remand is required pursuant to Stegall v. West, 11 Vet. App. 268 (1998)). 

The Board has considered whether quality assurance records from the Veterans Health Administration (VHA) may be available that are relevant to the claim for compensation under 38 U.S.C.A. § 1151. See VAOPGCPREC 1-2011(April 19, 2011) (holding that the duty to assist requires the AOJ or the Board to request quality assurance records from VHA and, if VHA denies access, to appeal such denial to the VA Office of General Counsel); see also Hood v. Shinseki, 23 Vet. App. (2009). However, it is VA's policy to destroy quality assurance records after three years unless needed for research or legal purposes. See Norvell v. Peake, 22 Vet. App. 194, 200 (2008) (citing VHA Records Control Schedule 10-1, at XXXIII-2 (Aug. 1, 2009)); see also VHA Records Control Schedule 10-1 (Mar. 1, 2011). As the medical treatment in question was performed in February 2008 and June 2009, any associated quality assurance records would have been routinely destroyed in 2012. It is thus not likely that remand for Quality Assurance records will result in retrieval of any documents helpful to the Veteran, so remand for such records is not called for in this case. See Sabonis v. Brown, 6 Vet. App. 426, 430 (1994) (holding that remands that would only result in imposing additional burdens on VA, with no benefit flowing to the claimant, are to be avoided).

The Veteran was afforded a hearing before the Board. In Bryant v. Shinseki, 23 Vet. App. 488 (2010), the United States Court of Appeals for Veterans Claims (Court) held that 38 C.F.R. § 3.103(c)(2) requires that the officer who chairs a hearing explain the issues and suggest the submission of evidence that may have been overlooked. Here, the VLJ and DRO identified the issue to the Veteran, who testified as to the surgery provided by VA on which the claim is based, and as to his symptoms before and after surgery. The Veteran has not asserted that VA failed to comply with 38 C.F.R. § 3.103(c)(2), nor has he identified any prejudice in the conduct of the hearings. The hearing focused on the elements necessary to substantiate the claim, and the Veteran provided testimony relevant to those elements. As such, the Board finds that no further action pursuant to Bryant is necessary, and the Veteran is not prejudiced by a decision at this time.
 
The Board finds that there is no indication in the record that any additional existing evidence relevant to the issue to be decided herein is available and not part of the claims file. Therefore, the Board will proceed to the merits of the Veteran's appeal. 

Analysis

A veteran may be awarded compensation for additional disability, not the result of his willful misconduct, if the disability was caused by hospital care, medical or surgical treatment, or examination furnished the veteran under any law administered by VA, either by a VA employee or in a VA facility as defined in 38 U.S.C.A. § 1701(3)(A), and the proximate cause of the disability was (1) carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of VA in furnishing the hospital care, medical or surgical treatment, or examination, or (2) an event not reasonably foreseeable. 38 U.S.C.A. § 1151; 38 C.F.R. § 3.361. 

To establish causation, the evidence must show that the hospital care, medical or surgical treatment or examination resulted in the veteran's additional disability or death. Merely showing that a veteran received care, treatment or examination and that the veteran has an additional disability or died does not establish cause. 38 C.F.R. § 3.361(c)(1).

Hospital care, medical or surgical treatment, or examination cannot cause the continuance or natural progress of a disease or injury for which the care, treatment, or examination was furnished unless VA's failure to timely diagnose and properly treat the disease or injury proximately caused the continuation or natural progress. 38 C.F.R. § 3.361(c)(2).

To establish that carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on VA's part in furnishing hospital care, medical or surgical treatment, or examination proximately caused a veteran's additional disability, it must be shown that the hospital care, medical or surgical treatment, or examination caused the veteran's additional disability and (1) VA failed to exercise the degree of care that would be expected of a reasonable health care provider, or (2) VA furnished the hospital care, medical or surgical treatment, or examination without the veteran's or, in appropriate cases, the veteran's representative's informed consent. 38 C.F.R. § 3.361(d)(1).

Whether the proximate cause of a veteran's additional disability was an event not reasonably foreseeable is in each claim to be determined based on what a reasonable health care provider would have foreseen. The event need not be completely unforeseeable or unimaginable but must be one that a reasonable health care provider would not have considered to be an ordinary risk of the treatment provided. In determining whether an event was reasonably foreseeable, VA will consider whether the risk of that event was the type of risk that a reasonable health care provider would have disclosed in connection with the informed consent procedures of 38 C.F.R. § 17.32. 38 C.F.R. § 3.361(d)(2).

Except as otherwise provided by law, a claimant has the responsibility to present and support a claim for benefits under the laws administered by VA. VA shall consider all information and medical and lay evidence of record. Where there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, VA shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; see also Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990). To deny a claim on its merits, the evidence must preponderate against the claim. Alemany v. Brown, 9 Vet. App. 518, 519 (1996), citing Gilbert, 1 Vet. App. at 54.

The Board has reviewed all the evidence in the record. Although the Board has an obligation to provide adequate reasons and bases supporting this decision, there is no requirement that the evidence submitted by the appellant or obtained on his behalf be discussed in detail. Rather, the Board's analysis below will focus specifically on what evidence is needed to substantiate each claim and what the evidence in the claims file shows, or fails to show, with respect to each claim. See Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000) and Timberlake v. Gober, 14 Vet. App. 122, 128-30 (2000).

For the sake of clarity, the ophthalmological terms used frequently below are defined as follows. "Diplopia" is synonymous with double vision. Stedman's Medical Dictionary, 27th ed., pg. 507. "Strabismus" is synonymous with crossed eyes. Id, pg. 1703. "Exotropia" is a form of strabismus. Id., pg. 632. "Macropsia" is a perception of objects as larger than they are. Id., pg. 1053.

The evidence of record clearly demonstrates the Veteran underwent cataract surgery on his left eye, provided by VA, on February 12, 2008. He also underwent bilateral rectus rescissions, performed to correct exotropia of the left eye, provided by VA, on June 19, 2009. The Veteran asserts on appeal that he had strabismus since childhood but he adamantly denies having had diplopia prior to VA surgery in February 2008. He asserts that prior to surgery his vision was perfectly correctible and that he had no functional visual impairment; he was a successful artist and photographer. He states that since that surgery he has had macropsia in one eye. As a result of this additional disability, he has nearly complete functional visual impairment and is no longer able to pursue his vocation.
 
The AOJ has essentially denied the appeal based on a finding that the Veteran had diplopia prior to the eye surgery in question and does not have an additional eye disability secondary to the VA surgery. The Veteran asserts on appeal that his claimed diplopia is proximately caused by "botched" eye surgery at VA that he did not have diplopia prior to surgery.

In regard to the question of whether the Veteran's diplopia preceded VA surgery, a letter from Dr. Woznica (an internist) dated in April 2010 states the Veteran had been under his care since 1988 but he had not complained of double vision until June 2008. Similarly, a March 2010 letter from Karol Opticians states the Veteran had received glasses and contact lenses at that facility since 1955 but had never complained of double vision. The Veteran's acquaintance Mr. HL testified before the Board that he had known the Veteran for 30 years, and that the Veteran never complained of double vision prior to VA surgery. Finally, Dr. Jeng, an ophthalmologist from whom the Veteran specifically sought an opinion, submitted a letter dated in April 2014, noting the Veteran denied having long-standing diplopia. Dr. Jeng cited a treatment note in January 2002 in which no diplopia was found and stated that VA clinic notes refer to a posterior capsular tear as the reason for treatment with long term eye drops but there was no evidence of such a tear on his examination that day. 

However, a VA optometry note in November 1999 shows the Veteran complained of diplopia in the left eye; the clinical impression was intermittent exotropia left eye with secondary anisometropia (anisometropia is unequal refractive power in the two eyes; see Stedman's at 89). A VA optometry note in July 2001 shows the presence of bilateral cataracts right worse than left, bilateral epiretinal membrane (ERM) right worse than left and longstanding strabismus of the left eye. A September 2001 letter from the Veteran's attending VA optometrist states the Veteran currently had blurred vision due to cataracts and distorted vision due to ERMs bilaterally. In February 2005 the Veteran complained to the VA primary care clinic (PCC) that he would have to give up his career as an artist due to visual disturbance. A June 2005 VA PCC note shows the continued presence of exotropia in the left eye. Due in part to his visual disorder, VA granted the Veteran nonservice-connected pension benefits in January 2006. In May 2007 a VA optometrist submitted a letter stating the Veteran currently had ERM, corneal dystrophy and strabismus that created double vision; these disorders in combination made it difficult for the Veteran to function visually. In August 2007 the Veteran presented to the VA optometry clinic complaining of constant and worsening double vision with diplopia that prevented him from working.

In January 2009 the Veteran submitted a letter complaining that he was presently severely visually impaired due to a "botched" cataract operation in which his retina was cut, resulting in permanent double vision and inability to read anything without a 10-power magnifying glass. (The Veteran has made no specific allegations of error or additional injury consequent to the VA surgery in June 2009).

In July 2009, at the Veteran's request, a VA optometrist wrote a letter stating that the Veteran had large ankle exotropia since birth with recent corrective surgery but still had intermittent exophoria. It was noted the Veteran had cataract surgery in the left eye in February 2008 and reported current constant diplopia with the image from one eye being considerably larger than the other. The optometrist stated this combination of problems did not allow the Veteran to use his two eyes together well, that he would lack depth perception, and would also suffer some mild blurred vision; the optometrist stated it was unlikely the Veteran's vision would improve significantly in the near future. The Veteran subsequently asked the VA optometrist to a change his letter because he did not think his condition was "mild" and because he wanted documentation he could not work due to his vision problems. In response, the VA optometrist wrote an amended letter in July 2009 stating the Veteran reported being unable to work as an artist because of his disability. 

The Veteran had a VA examination in May 2011, performed by an optometrist who reviewed the claims file and noted clinical observations in detail. Macular optical coherence tomography (OCT) showed stable macular findings bilaterally and ERM right worse than left, correlating with decreased acuity right worse than left and subjective distortion/metamorphosia/macropsia right worse than left. The Veteran's current visual acuity was 20/30+ in the right eye and 20/25- in the left. The examiner stated the Veteran's subsequent decrease in acuity was likely due to the ERM, of which the Veteran was warned prior to surgery. The examiner noted that although the Veteran alleges his diplopia and macropsia were due to negligent surgery, it is more likely that macropsia is due to the preexisting ERM, while diplopia is more likely due to the longstanding strabismus for which correction was attempted in June 2009. 

The Veteran was examined in June 2011 by Dr. Stoj, an ophthalmologist. Dr. Stoj noted clinical observations in detail. Dr. Stoj's assessment was that because of cataract surgery there had been a change of refraction in the left eye, as a result of which visual acuity (near and distance) would be affected and strabismus and the ability of the eyes to work together could be affected. From a retinal perspective, the Veteran had bilateral retinal puckers but no retinal damage. Dr. Stoj noted that the Veteran's vision was still "quite good." 

The file contains a letter dated in July 2011 from Dr. Tischler, an optometrist who noted the Veteran had strabismus since childhood but was not aware of any diplopia prior to his cataract surgery; since surgery the Veteran had diplopia complaints and saw larger with the left eye. The Veteran's current left eye acuity was 20/25-4 and his right eye acuity was 20/70, correctible to 20/25-3. Visual acuity appeared to be decreased by bilateral macular puckers, and the double vision appeared to be due to cataract surgery in the left eye.

In May 2013 the file was reviewed by a VA ophthalmologist who noted the Veteran had three surgeries by VA: left eye cataract surgery in February 2008, bilateral eye muscle surgery in June 2009 and right eye cataract surgery in March 2010. The ophthalmologist noted the Veteran was shown to have strabismus with exotropia since childhood and to have complained of horizontal diplopia (double vision) for nearly 10 years prior to the VA surgery. In March 2007 the Veteran complained of "constant" diplopia, but in January 2011 (after surgery) he reported only intermittent diplopia. Thus, the Veteran's longstanding diplopia was not exacerbated by surgery.

The VA ophthalmologist also noted that age-related macular degeneration of both eyes was documented in November 1999, and that ERM bilaterally (right worse than left) was documented in July 2001. The Veteran had complained of metamorphosia (image distortion), a condition relating to ERM, since May 2004. The Veteran has complained of macropsia (differential image magnification) since June 2009; this is due to the more severe ERM in the right eye. Thus, the Veteran's retinal conditions long predate his eye surgeries and neither was exacerbated by the surgeries. In that regard, the ERMs were noted to be stable in May 2011.

In regard to loss of visual acuity, the ophthalmologist noted that the Veteran's best corrected vision prior to surgery was 20/30 in the right eye and 20/40 in the left eye. Prior to surgery the Veteran was warned that his vision might not improve to 20/20 postoperatively due to his macular pathology, and that it was possible his ERM could worsen; the records show the Veteran expressed understanding of these risks and wished to proceed with cataract surgery. In January 2011 the Veteran's postoperative vision had improved to 20/25- in the right eye and 20/25 in the left eye, with only intermittent strabismus; this was after all three VA surgeries. Thus, his visual acuity objectively improved after surgery and there is no evidence the Veteran's longstanding retinal condition was worsened either by the cataract surgery in February 2008 or strabismus surgery in June 2009. Also, refractive error simply refers to the need for glasses and is not an ocular disease. 

The VA ophthalmologist was demonstrably fully informed of the factual premises, reviewed the entire claims file, and provided a fully-articulated opinion supported by reasoned analysis. The Board finds this opinion is entitled to great probative weight. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 303-304 (2008) (holding that it is the factually accurate, fully articulated, sound reasoning for the conclusion that contributes to the probative value of a medical opinion).

The Veteran has submitted statements from Dr. Woznica, Dr. Tischler, Dr. Jeng and Karol Opticians in support of his contention that he did not have diplopia prior to 2008; similarly, Mr. HL testified the Veteran had not complained to him of "double vision" prior to surgery. However, while the Veteran may not have complained of diplopia to these persons, he clearly complained of diplopia to a number of VA clinicians. The Board finds the affirmative statements on several occasions to VA treatment providers of experiencing diplopia/double vision prior to the surgery is more persuasive and probative of the presence of such than statements filed in response to the claim for benefits. See Madden v. Gober, 123 F.3d 1477, 1481 (Fed. Cir. 1997) (the Board is entitled to discount the weight, credibility, and probity of evidence in light of its own inherent characteristics and its relationship to other items of evidence). Indeed, attempts to obtain treatment record from the private providers to support their recollections could not be accomplished as the Veteran did not provide the requested release forms. See Wood v. Derwinski, 1 Vet. App. 190, 193 (1991) ("The duty to assist is not always a one-way street. If a veteran wishes help, he cannot passively wait for it in those circumstances where he may or should have information that is essential in obtaining the putative evidence."). 

Thus, the Board finds that the most probative evidence indicates the Veteran did, in fact, suffer from diplopia prior to his surgery in 2008. Further, nothing in the medical evidence contradicts the VA ophthalmologist's finding that the preexisting conditions (diplopia, corneal dystrophy, ERM with metamorphosia, and strabismus) were not aggravated by the VA surgery. Additionally, both the VA examining optometrist and the VA ophthalmologist stated opinions agreeing that the macropsia is due to the preexisting ERM and is not proximately caused by the VA surgery in question. This opinion is not directly controverted by any other medical opinion of record. 

To the extent any of the other opinions of record suggest that the Veteran's cataract surgery caused his diplopia, those opinions were based on the Veteran's report of not experiencing that symptom prior to surgery, which the Board has found lacks credibility. 

The Veteran has asserted his own opinion that he has additional disability that is proximately caused by VA surgery. However, the etiology of an eye disorder is a complex medical question, especially given the Veteran's documented history of eye disorders prior to surgery. Accordingly, the Veteran is not competent to assert a relationship between his symptoms and the VA surgery in question. Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007); Kahana v. Shinseki, 24 Vet. App. 428 (2011).

The Board further finds the Veteran's account of his impairment post-surgery, compared to his impairment prior to surgery, to be not credible. The Veteran's account of essentially normal functioning prior to surgery is internally inconsistent with the February 2005 VA PCC note in which he asserted he would have to give up his occupation due to his visual problems. His account of being functionally unable to see at near or far distances is controverted by VA and private treatment records which show him to have "quite good" vision post-surgery (citing the opinion by Dr. Stoj). Finally, the Veteran presented to his VA ophthalmologist in August 2009 and complained of double vision since his first VA surgery in February 2008, denied any double vision before then and complained that somebody had made a hole in his retina during surgery, but he also made a point of needing disability benefits because he had recently lost benefits from a disability of the spine (apparently referring to revocation of his VA nonservice-connected pension due to excessive income). Thus, the Veteran is shown to have monetary interest in the claim that affects the credibility of his account. See Cartright v. Derwinski, 2 Vet. App. 24, 25 (1991) (VA cannot ignore a veteran's testimony simply because the veteran is an interested party; personal interest may, however, affect the credibility of the evidence). 

The Board also acknowledges that in his testimony before the Board and before the DRO, and in his correspondence to VA, the Veteran has asserted fault on the part of his VA medical providers in several respects.

First, the Veteran asserts that he wanted to have surgery in February 2008 to repair his muscular disorder of the eyes (i.e., strabismus repair) and he was surprised on the day of surgery to be informed that he was scheduled to undergo cataract surgery instead. He essentially contends that VA surgeons failed to coordinate the procedure to be performed, and that he was pressured in to proceeding with the cataract surgery despite his misgivings. He also contends that on a medical basis he should have had surgery to repair the muscle before having cataract surgery. 

The Board finds the Veteran's assertion above is contrary to the objective evidence of record. The Veteran had been scheduled for VA strabismus correction in October 2007, but in November 2007 he asked why his cataracts could not be corrected first. The Veteran was informed that he would not benefit from cataract surgery unless his left-eye strabismus (dominant eye) was corrected first, but the Veteran stated he was worried about the possibility of permanent diplopia after surgery and declined strabismus surgery until he could obtain a second opinion. In January 2008 the Veteran stated that at this point he only wanted to have left cataract removal and stated he recognized that he might have diplopia, loss of visual acuity or loss of the eye after surgery, and that diplopia might be worse after surgery. The Veteran stated he wished to proceed with cataract surgery. On February 11, one day prior to surgery, the surgeon confirmed that the Veteran wanted cataract removal, only, at that point; as noted below the Veteran gave his informed consent to cataract extraction (CE) surgery. Thus, the evidence of record clearly shows the Veteran wanted to have cataract surgery prior to strabismus correction, and that cataract extraction, rather than strabismus surgery, was not a surprise to him. The Veteran has not presented any evidence showing that it was negligent of VA surgeons to perform cataract surgery (at his request) prior to strabismus surgery. 

Second, the Veteran asserts that during cataract surgery the surgeon failed to pass a bright light in front of his eyes to check for light reactivity; as a result, his eye reacted to the light on the surgeon's head and the surgeon cut his retina (later, he asserted instead that the surgeon had punctured his posterior sac). The Veteran heard the surgeon exclaim, "Oh, [expletive], I've cut the retina. [Expletive], I can't get the flap back!" The male nurse told the Veteran that the surgeon had been "joking" (in a recent letter, received in July 2014, the Veteran attributed the latter remark to the attending anesthesiologist). 

The Board finds there is no evidence the surgeon cut the Veteran's retina. The operative report from the February 2008 surgery documents that the Veteran had a posterior capsular tear as a complication during surgery, but the VA examiner in May 2011 noted that a capsular tear is not the same as a retinal tear. The Veteran presented to the VA ophthalmology clinic in August 2009 complaining that somebody had made a hole in his retina during surgery, but the ophthalmologist explained to the Veteran that there was no "hole" in his retina. Also, Dr. Stoj stated in June 2011 that there was no retinal damage.

In regard to the posterior capsular tear, a treatment note by the VA retina clinic in July 2008 states the posterior capsular tear had resulted in subsequent cataract macular edema (CME), but a VA ophthalmology note states the Veteran's left eye CME resolved by May 2009. The VA examiner in May 2011 also noted that during cataract surgery a capsular tear occurred that may have contributed to the development of postoperative CME, but this was diagnosed, treated and resolved. The examiner further stated a capsular tear is a common complication of surgery and does not constitute fault on the part of the surgeon; proper surgical and post-surgical care was provided. 

Similarly, the VA ophthalmologist in May 2013 stated that a capsular tear is not an uncommon occurrence during cataract surgery; in the Veteran's case, it neither precluded placement of a standard intraocular lens implant in the capsule nor required a vitrectomy. Likewise, CME is not uncommon after cataract surgery and can occur even in the absence of a posterior capsular tear. The ophthalmologist stated that neither a capsular tear nor the development of CME is the result of negligence, carelessness, lack of skill, or error in judgment on the part of the surgeon; the Veteran's CME was appropriately treated with a standard medication regimen and resolved. Finally, the Board notes that the April 2014 letter by Dr. Jeng states that no capsular tear was found on examination, demonstrating that the capsular tear during surgery had completely resolved. In sum, there is no indication of any surgical complication other than capsular tear, which is a common complication and which in any case resolved after surgery.

Third, the Veteran asserted during his videoconference hearing before the Board that he did not provide informed consent to surgery and that he would not have agreed to surgery had he known of the additional disability that would result.

The Board finds that the Veteran is shown to have provided informed consent. On the day prior to surgery (February 11, 2008) the VA ophthalmologic surgeon informed the Veteran that risks associated with CE include diplopia, loss of visual acuity or loss of the eye. He was informed that diplopia may be worse after CE and that he would likely be considered for strabismus surgery after CE. Further, both the VA examiner and the VA ophthalmologist agreed the Veteran gave informed consent to prior to cataract surgery. (The Veteran has not asserted any specific complaint regarding the June 2009 bilateral rectus rescission surgery, but the record shows that prior to that surgery the Veteran was informed of risks including but not limited to persistent misalignment after surgery, need for more surgery, infection, bleeding, loss of vision and double vision; thus informed consent is shown in regard to the June 2009 surgery as well.) The Board finds the Veteran's assertion that he did not provide informed consent is not credible. Indeed, VA treatment records from November 2007 and January 2008 reflect the Veteran was aware of the risks of the surgery, to include diplopia.

Fourth, the Veteran asserts that he recently consulted a noted neuro-ophthalmologist, who told him that prior to cataract surgery a patient with strabismus should have had the eye "pinned" to prevent the eye from moving. The Veteran asserts that failure to "pin" the eye was negligence, which led to the reported puncture that in turn led to his claimed additional disability. However, the Veteran has not provided any actual documentation from that ophthalmologist, or any other competent medical professional, to document that "pinning" is a precaution that would have been performed by a reasonable cataract surgeon in February 2008. Further, as noted above, there is no documentation of any "puncture" other than capsular tear, which resolved after surgery. 

The Veteran has made a number of allegations of a cover-up by VA in regard to the reportedly "botched" cataract surgery. He asserts that the actual operative report from February 2008 was mislaid, and a postoperative report was rewritten to eliminate reference to surgical error. He asserts a medical resident at the VA eye clinic who agreed with the Veteran's theory was prematurely reassigned to another location. The Veteran asserts that in an effort to locate the operating surgeon he called the physician at Yale Medical School who runs the surgical resident program, but the physician subsequently told VA that he would discontinue the residency program if the Veteran ever contacted him again. He also complained that his attending VA optometrist refused to conduct an inquiry regarding the cataract surgery in February 2008. Finally, he states that he spoke to three physicians outside VA and they all agreed that the Veteran's contentions were certainly possible, but all three refused to say so in writing. The Board finds these assertions of a "cover up" unsupported and not credible, especially in light of the questionable credibility reflected in other assertions in support of this claim. Indeed, many of the Veteran's assertions during the course of this claim are directly contradicted by the evidence of record (i.e. denying diplopia prior to surgery when VA treatment records note that specific complaint; claiming to be surprised on the day of surgery that cataract surgery was being done rather than muscle surgery; claiming that he was unaware of the risks when multiple VA treatment notes reflect his acknowledgment/concern over possible outcomes, etc.). See Caluza v. Brown, 7 Vet. App. 498, 511 (1995) (the credibility of a witness can be impeached by a showing of interest, bias, or inconsistent statements).

Finally, the Board finds that the Veteran does not have additional disability due to an event not reasonably foreseeable. Even accepting for the sake of argument that there was a decrease in visual acuity or an increase in diplopia from the surgery, the probative medical evidence of record notes such would be a reasonably foreseeable risk of surgery, as is posterior capsular tear and resultant CME. While the Veteran has developed macropsia since surgery, this is shown by the most probative medical evidence to be due to EMT and not to the surgery. 

In sum, the Board finds that the preponderance of the probative evidence is against a finding that the Veteran has additional eye disability that was proximately caused by carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on VA's part in providing such treatment or by an event not reasonably foreseeable. Furthermore, the preponderance of the competent and credible evidence reflects that informed consent was given for the surgeries. Accordingly, the criteria for compensation under 38 U.S.C.A. § 1151 are not met and the claim must be denied.

Because the preponderance of the evidence is against the claim the benefit-of-the-doubt rule does not apply. Gilbert, 1 Vet. App. 49, 54.


ORDER

Entitlement to compensation pursuant to the provisions of 38 U.S.C.A. § 1151 for an eye disability due to surgeries performed at a VA facility in February 2008 and June 2009 is denied. 



____________________________________________
K. A. BANFIELD
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs